PHILLIPS PETROLEUM COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent.

Panhandle Eastern Pipe Line Company, Intervener.

No. 5695.

United States Court of Appeals Tenth Circuit.

July 23, 1958.

As Amended Aug. 15, 1958.

Kenneth Heady, Bartlesville, Okl. (Rayburn L. Foster and Harry D. Turner, Bartlesville, Okl., on the briefs), for petitioner.

William W. Ross, Atty., F. P. C., Washington, D. C. (Willard W. Gatchell, General Counsel, F. P. C., and Howard E. Wahrenbrock, Solicitor, F. P. C., and Alfred Avins, Atty., F. P. C.,

Washington, D. C., on the brief), for respondent.

Raymond N. Shibley, Washington, D. C. (Steptoe & Johnson, Washington, D. C., of counsel, on the brief), for intervener.

Before BRATTON, Chief Judge, and PHILLIPS and BREITENSTEIN, Circuit Judges.

PHILLIPS, Circuit Judge.

This is a petition by Phillips Petroleum Company,[1] filed under § 19(b) of the Natural Gas Act, 52 Stat. 831, 15 U.S.C.A. § 717r(b), to review and set aside an order of the Federal Power Commission, hereinafter referred to as the Commission, "In the Matter of Phillips Petroleum Company, Docket No. G-10,908.

On February 1, 1937, a contract[2] for the sale of natural gas was entered into by the Shamrock Oil & Gas Corporation,[3] as seller, and the Panhandle Eastern Pipe Line Company,[4] as buyer. On March 11, 1944, Shamrock's interest in the contract and the oil and gas leases from which the gas covered by the contract was being produced was assigned to Phillips and Phillips assumed Shamrock's obligations under the contract. The contract fixed the base price of gas at 3½¢ per Mcf at 16.4 psia.

Paragraph 15(b) of the contract provided:

"(b) If at the end of five years from date hereof the weighted average royalty rate being paid to land and royalty owners on gas produced in Moore County, Texas and delivered to major pipe line companies, including the Buyer, operating pipe lines comparable in size and length to the main pipe line operated by Buyer and required to be paid by Seller to the owners of the royalty interest in the gas produced from the lands covered by the terms hereof is in excess of ⅛ of 4¢ per 1000 cubic feet, then and in that event the 3½¢ price per 1000 cubic feet to be paid hereunder for the next ensuing five year period shall be increased in the amount that such royalty rate exceeds ⅛ of 4¢ per 1000 cubic feet, but in no event shall such 3½¢ price to be paid for gas sold and delivered hereunder during said ensuing five year period be increased more than ½₆¢ per 1000 cubic feet."

Paragraph 15(c) of the contract, by substantially the same language as Paragraph 15(b), provided for an increase in the 3½¢ price, on the basis of the weighted average royalty rate, at the end of ten years from the date of the contract, except that Paragraph 15(c) provided:

"* * * but in no event shall the 3½¢ price to be paid for gas sold and delivered hereunder during said ensuing five year period be increased more than ⅛¢ per 1000 cubic feet."

Paragraph 15(d) of the contract provided:

"(d) If at the end of fifteen years from and after the date hereof the weighted average royalty rate being paid on gas produced in Moore County, Texas and delivered to such major pipe line companies and required to be paid by Seller to the owners of the royalty interest in the gas produced from the lands covered hereby is in excess of ⅛ of 4¢ per 1000 cubic feet, then the 3½¢ price per 1000 cubic feet to be paid thereafter by Buyer to Seller for gas sold and delivered hereunder shall be increased in the amount that such royalty rate exceeds ⅛ of 4¢ per 1000 cubic feet."

Prior to the time that Phillips acquired the contract, Panhandle and Shamrock agreed to a price adjustment under Paragraph 15(b) of the contract, by which the price was increased to 3%₆¢ per Mcf at 16.4 psia. Thereafter, Pan-

---

1. Hereinafter called Phillips.
2. Hereinafter called the contract.
3. Hereinafter called Shamrock.
4. Hereinafter called Panhandle.

handle paid Shamrock at that rate. No price adjustment was made at the end of the second five-year period, under Paragraph 15(c) of the contract. At the end of the 15-year period from the date of the contract no price adjustment was made under Paragraph 15(d) of the contract, but by letter dated February 25, 1952, Panhandle proposed that the determination of any adjustment under the provisions of Paragraph 15(d) be deferred pending final disposition of a rate increase sought by Panhandle before the Commission and that " * * * in the meantime Panhandle continue to make payment for the gas at the rate of 3⅞₆¢ per Mcf, (plus any royalty adjustment which may be determined due under Par. 15(d)) * * * ". Phillips accepted such proposal on March 10, 1952. Phillips and Panhandle disagreed as to the interpretation of Paragraph 15(d) of the contract. Phillips contended that it provided for periodic increases after February 1, 1952. Panhandle contended it provided for only one increase, and that on February 1, 1952. But the obligation to pay the increase under Paragraph 15(d) was not released. Payment thereof was merely deferred.

In Phillips Petroleum Co. v. State of Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794, 796, 98 L.Ed. 1035 (decided June 7, 1954) the Supreme Court of the United States held that independent natural gas producers who sell gas in interstate commerce for resale are "natural gas companies" and their sales are subject to the jurisdiction of and to rate regulation by the Federal Power Commission.

On August 6, 1954, the Commission issued additional Regulations (19 F.R. No. 156, pp. 5081–5083), superseding Regulations promulgated by Order 174 of the Commission, which was issued July 16, 1954, relative to independent producers, as defined in such Regulations (19 F.R.No. 141, pp. 4534–4537).

Section 154.91 of the August 6th Regulations reads:

" 'Independent producer' defined. An 'independent producer' as that term is used in §§ 154.91 to 154.102

means any person as defined in the Natural Gas Act who is engaged in the production or gathering of natural gas and who transports natural gas in interstate commerce or sells natural gas in interstate commerce for resale, but who is not primarily engaged in the operation of an interstate pipeline."

Section 154.92 of the August 6th Regulations in part provides:

"*Filing of rate schedules by producer-gatherer 'Natural-Gas Companies.'* (a) Every independent producer who, on or since June 7, 1954, has engaged in the interstate transportation or sale of natural gas subject to the jurisdiction of the Commission shall on or before October 1, 1954, file with the Commission rate schedules, as defined in § 154.93, setting forth the terms and conditions of service and all rates and charges for such transportation or sale effective on June 7, 1954. To each such rate schedule there shall be attached a statement showing actual billing for a recent month in sufficient detail to show how the billing amount is determined."

Section 154.93 of the August 6th Regulations in part provides:

"*Rate schedule defined.* For the purpose of §§ 154.91 through 154.-102 'rate schedule' shall mean the basic contract and all supplements or agreements amendatory thereof, effective and applicable on and after June 7, 1954, showing the service to be provided and the rates and charges, terms, conditions, classifications, practices, rules and regulations affecting or relating to such rate or charges, applicable to the transportation of natural gas in interstate commerce or the sale of natural gas in interstate commerce for resale subject to the jurisdiction of the Commission."

Section 154.94 of the August 6th Regulations in part provides:

"*Changes in rate schedules.* (a) No change shall be made in any

rate, charge, or service in effect on and after June 7, 1954, for the interstate transportation or sale of natural gas in interstate commerce subject to the jurisdiction of the Commission by any independent producer required to file rate schedules pursuant to § 154.92, without first filing a change in rates pursuant to section 4(d) of the Natural Gas Act [15 U.S.C.A. § 717c(d)] and in accordance with this section.

\*　　\*　　\*　　\*　　\*

"(c) The operation of any provision of the rate schedule providing for future or periodic changes in the rate, charge, classification, or service after June 7, 1954, or the effective date of any rate schedule for initial service after June 7, 1954, shall constitute a change in rate schedule."

Pursuant to the provisions of § 154.92 (a) Phillips, on September 27, 1954, filed with the Commission as its F.P.C. Gas Rate Schedule No. 61, copies of the contract and supplements thereto and attached to the Rate Schedule photostatic copies of ten separate billing statements, prepared and furnished by Panhandle, which showed the amount being paid by Panhandle and received by Phillips for gas delivered under the contract on June 7, 1954, was 3.18236¢ per Mcf at 14.65 psia (3³⁄₁₆¢ per Mcf at 16.4 psia).

Thereafter, Phillips ascertained the weighted average royalty rate being paid in Moore County, Texas, for the months from February to June, 1954, inclusive. It determined that the price adjustment provisions of Paragraph 15(d) of the contract, when applied to the weighted average royalty rates in effect during June, 1954, resulted in a price in effect under the contract on June 7, 1954, of 3.69863¢ per Mcf at 14.65 psia, or an increase of .51627¢ per Mcf over the amount actually being paid by Panhandle on June 7, 1954. Following that determination, Phillips prepared and on June 29, 1956, tendered for filing with the Commission revised billing statements showing the rate in effect on June 7,

1954, under Rate Schedule No. 61 was 3.69863¢ per Mcf at 14.65 psia. In its letter transmitting such revised billing statements to the Commission, Phillips stated that the billing statements first filed were incorrect and did not reflect the proper billing "provided by said Rate Schedule No. 61" and that it was transmitting copies of revised billing statements which reflected "correct billings for the month of June, 1954."

Panhandle intervened and protested the filing by Phillips of the revised billing statements.

On August 16, 1956, the Commission entered an order in which it found:

"It is necessary and proper in the public interest and to aid in the enforcement of the provisions of the Natural Gas Act that a hearing be held to determine the correct rate as of June 7, 1954, for the sale of natural gas by Phillips under its F PC Gas Rate Schedule No. 61 to Panhandle Eastern Pipe Line Company."

and ordered:

" \* \* \* a public hearing to be held, pursuant to the authority contained in and subject to the jurisdiction conferred upon the Federal Power Commission by sections 4, 15 and 16 of the Natural Gas Act [15 U.S.C.A. §§ 717c, 717n, 717o], and the Commission's Rules of Practice and Procedure \* \* \* concerning the matter involved in the issues presented by the submittal by Phillips of the revised billing statements for sales of gas by it to Panhandle Eastern Pipe Line Company under Phillips' FPC Gas Rate Schedule No. 61, and the protest thereto by Panhandle."

and further ordered that the matter be set for hearing by a duly designated Presiding Examiner.

Pursuant to such order, hearings were held in Washington in September and October, 1956, at which extensive testimony was taken and exhibits were introduced in evidence. Panhandle, the Com-

mission staff and Phillips actively participated in all phases of the hearings. The parties were in agreement at the hearings that an increase under Paragraph 15(d) could have been placed in effect, as of February 1, 1952. However, Phillips contended that Paragraph 15(d) required monthly price adjustments based on fluctuations of the weighted average royalty rate after February 1, 1952, and Panhandle contended that Paragraph 15(d) provided for only one price adjustment on February 1, 1952. Phillips and Panhandle also disagreed as to the proper method of determining the weighted average royalty rate in Moore County.

A third dispute involved the interpretation of Paragraph 15(a) of the contract, which provided for proportional adjustments in the base price, if the resale prices to be received by Panhandle for gas delivered to the Detroit City Gas Company were changed when the Detroit resale contract was renewed or extended. Panhandle contended it was entitled to a reduction in the base rate, because of reductions in its Detroit resale rate made, not by the parties on an extension or renewal of the contract, but pursuant to an order of the Commission. Phillips disputed that contention.

In his decision the Examiner recited:

"The parties are all agreed here that Phillips was legally entitled to at least the single par. 15(d) royalty adjustment as of February 1, 1952 under the terms of the contract, and it is not contended by any of the parties that Phillips lost its contractual right to such an adjustment prior to June 7, 1954 by any act or omission to act such as laches or the operation of the statute of limitations. As a matter of fact, the parties themselves made it clear that par. 15(d) continued to be operative, subject only to the question as to the proper interpretation of that provision. * * *"

The Examiner concluded that Paragraph 15(a) was inapplicable to rate changes made by the Commission and denied the adjustment sought by Panhandle. The examiner further determined that Phillips was contractually entitled to a single February 1, 1952, increase provided for in Paragraph 15(d) of the contract, resolved the dispute as to the proper method of computing the price adjustments under that paragraph and held that Phillips was entitled to have its billing statements corrected to reflect such increase, which amounted to .33711¢ per Mcf at 14.65 psia, resulting in a total price of 3.46363¢ per Mcf at 14.65 psia. He denied the other increases sought by Phillips and the decrease sought by Panhandle. The examiner ordered Phillips to file revised billing statements reflecting the rate as of June 7, 1954, of 3.46363¢ per Mcf at 14.65 psia.

The Commission staff and Phillips filed exceptions to the Examiner's decision and Phillips also petitioned to reopen the hearing to introduce additional evidence.

On April 5, 1957, the Commission issued an order reversing the decision of the Examiner. In its decision the Commission stated:

"This proceeding, which was instituted by Commission order dated August 16, 1956, to determine what is the 'correct rate as of June 7, 1954, for the sale of natural gas by Phillips under its FPC Gas Rate Schedule No. 61,' involves four general questions: (1) as set forth in the August 16, 1956, order * * * what is the 'correct rate' for the sale of natural gas by Phillips Petroleum Company (Phillips) under its Rate Schedule No. 61, to Panhandle Eastern Pipe Line Company (Panhandle); (2) whether Phillips is to be permitted to revise its billing statement for gas sold to Panhandle and charge an increased rate therefor, without filing any 'change in rates' under Section 154.94 of the Commission's regulations and Section 4(d) of the Natural Gas Act (Act); (3) whether Phillips should be required, at Panhandle's instance, to decrease the charge for gas sold

to Panhandle by reason of certain price adjustment provisions contained in paragraph 15(a) of the Phillips-Panhandle contract; and (4) whether the record in this case should be reopened at Phillips' request to permit Phillips to put in evidence of specified lease agreements, claimed to substantiate Phillips' interpretation of the Phillips-Panhandle contract and support the allowance of an amount above that which the presiding examiner determined should be allowed Phillips. Phillips' FPC Gate Rate Schedule No. 61, which contains the rate provisions in issue, consists of the gas sales contract between Phillips and Panhandle which Phillips had filed earlier, on September 27, 1954, pursuant to Section 154.92(a) of the Commission's regulations under the Act, applicable to independent producer natural-gas companies.

"The procedural posture of this case brings question (2) into controlling prominence, and as will be seen, resolution of it effectively disposes of most of the other issues."

The Commission did not reach the questions of contract interpretation and application, which the Examiner had resolved, in the course of determining the correct rate which Phillips was entitled to charge under its Rate Schedule No. 61. The Commission determined that the effective rate under such Rate Schedule No. 61 was the rate reflected by copies of the billing statements, which, along with a copy of the original contract, Phillips filed with the Commission on September 27, 1954, and the rate actually being paid by Panhandle on June 7, 1954, namely, 3.18236¢ per Mcf, saying that "was the rate actually effective and actually being paid by Panhandle on June 7, 1954"; and that a change in such rate could only be effected by the filing by Phillips of a change in rates pursuant to § 4(d) of the Natural Gas Act and § 154.94(a), supra. It held the fact that Phillips might have been contractually entitled to a higher rate on June 7, 1954,

was not pertinent to the inquiry, nor controlling, since the billing statements did not reflect such higher rate, nor was Phillips charging nor Panhandle paying such higher rate on June 7, 1954. In its decision the Commission further stated:

"As to questions (1) and (3) listed at the outset, we consider that we should not, at the present time in this proceeding, undertake to pass upon these matters, involving as they do an interpretation of the Phillips-Panhandle contract, and a purported determination of the private rights and obligations arising thereunder. We have determined what Phillips' effective rate is. And we have determined that Phillips must file a change in rates in order to increase its rates. These things we can appropriately do and should do now. Beyond this, however, we are not required to go and should not go in this proceeding and at this time. * * *"

Thus, it will be seen that the Commission, in effect, decided that the price being paid by Panhandle to Phillips for gas delivered under the contract on June 7, 1954, as reflected by the billing statements filed on September 27, 1954, and not the price which Panhandle was obligated to pay and Phillips was entitled to receive on June 7, 1954, under the terms of the contract, was the effective rate under Rate Schedule No. 61 and, therefore, it was neither necessary nor appropriate for the Commission to determine whether the Examiner had correctly construed and applied the provisions of the contract.

The Commission ordered that the Examiner's decision "is hereby reversed" and that "The revised billing statement tendered for filing by Phillips Petroleum Company on June 29, 1956, under its FPC Gas Rate Schedule No. 61, is hereby rejected."

Phillips filed an application for a rehearing, which the Commission denied on May 31, 1957.

On June 14, 1957, Phillips tendered for filing a proposed change in rate which Panhandle would be required to pay for gas purchased under the contract. The proposed rate was 3.9102¢ per Mcf at 14.65 psia. The Commission suspended such rate increase temporarily and ordered a hearing thereon. Thereafter, on August 30, the Commission issued an order making effective the proposed rate change upon filing by Phillips of an undertaking to refund any portion of the increased rates found by the Commission not to be justified. Pursuant to that order Phillips is now collecting from Panhandle the increased rate.

Panhandle filed a brief as intervener and participated through its counsel in the oral argument in this court. It contends that what Phillips actually sought was a determination by the Commission by an order in the nature of a declaratory order of the correct rate in effect on June 7, 1954, under Rate Schedule No. 61. That contention is not without substance. In its petition for review, filed in this court, Phillips stated: "The purpose of the proceeding before the Commission was to determine petitioner's correct rate as of June 7, 1954, for the sale of gas to Panhandle * * *." The order of reference to the Examiner stated that it was "necessary and proper in the public interest * * * that a hearing be held to determine the correct rate as of June 7, 1954, for the sale of natural gas by Phillips under its FPC Gas Rate Schedule No. 61, to Panhandle Eastern Pipeline Company." The decision reversing the Examiner stated: "This proceeding, which was instituted by Commission order * * * to determine what is the 'correct rate as of June 7, 1954, for the sale of natural gas by Phillips under its FPC Gas Rate Schedule No. 61,' * * * *"

Predicated on the premise that what Phillips really sought was an order in the nature of a declaratory order, determining what was the correct rate in effect on June 7, 1954, under Rate Schedule No. 61, Panhandle asserts that since the Commission only has power by order to fix rates "to be thereafter observed and enforced" and not to operate retrospectively [5] and has no power to make reparation orders, the Commission was without jurisdiction to determine what was the correct rate in effect under Rate Schedule No. 61 on June 7, 1954, in a proceeding begun and an order made in 1956, and cites as its authority for that contention Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 618, 64 S.Ct. 281, 88 L.Ed. 333.

Counsel for the Commission contend that the dispositive question decided by the Commission was "whether Phillips is to be permitted to revise its billing statement for gas sold to Panhandle and charge an increased rate therefor without filing any 'change in rates' under Section 154.94 of the Commission's regulations and Section 4(d) of the Natural Gas Act" and that "The heart of the Commission's action * * * was the rejection of the tendered revision of the previously filed billing statement"; and that since the Commission, by § 154.92, supra, of its Regulations, required the filing of billing statements along with a rate schedule, as defined in § 154.93 of such Regulations, the Commission had jurisdiction to construe its Regulations and determine whether a revised or corrected billing statement could be filed by Phillips. We think there can be no doubt that the Commission had jurisdiction to determine whether it would permit the filing of the revised or corrected billing statement, under its general power to make "orders * * * necessary or appropriate to carry out the provisions of this Act." [6] However, in reaching that ultimate determination, the Commission decided two preliminary issues, which were essential

---

5. See § 5 of the Natural Gas Act, 15 U.S. C.A. § 717d(a).

6. § 16 of the Natural Gas Act, 52 Stat. 830, 15 U.S.C.A. § 717o; United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 347, 76 S.Ct. 373, 100 L.Ed. 373.

to a determination of whether it should permit the filing of the revised or corrected billing statement. One, it decided that the effective rate on June 7, 1954, under Rate Schedule No. 61 was 3.18236¢ per Mcf, and two, that such rate could not be increased by filing of the revised or corrected billing statement, but only through the filing of a change in rates, pursuant to § 4(d) of the Natural Gas Act and § 154.94(a), supra. However, we are of the opinion that the Commission had jurisdiction to determine those preliminary matters. In order for the Commission to determine whether it would permit the revised or corrected billing statement to be filed, it was necessary for the Commission to determine the rate legally effective under Rate Schedule No. 61 on June 7, 1954, and whether the revised or corrected billing statement would reflect a rate different from such legally effective rate, and, if so, whether Phillips, to effect such change in rates, would have to file a change in rates pursuant to § 4(d) of the Natural Gas Act and § 154.94 of the Regulations. In other words, in order to determine the ultimate question, it was necessary for the Commission to determine, as an incident of its jurisdiction to determine the ultimate question, the preliminary questions to which we have adverted.

Moreover, if Phillips sought a determination of the correct rate on June 7, 1954, for the sale of natural gas by Phillips to Panhandle under Rate Schedule No. 61, by an order in the nature of a declaratory order, which for the purposes of what we are about to say we will assume but not decide, we still think the Commission had jurisdiction to make such determination. Section 5(d) of the Administrative Procedure Act, 5 U.S.C.A. § 1004(d) provides:

"(d) The agency is authorized in its sound discretion, with like effect as in the case of other orders, to issue a declaratory order to terminate a controversy or remove uncertainty. June 11, 1946, c. 324, § 5, 60 Stat. 239."

There was a controversy as to the amount Phillips was entitled to receive for gas sold and delivered to Panhandle under its contract and Rate Schedule No. 61 on June 7, 1954, and there was uncertainty as to such amount. It was within the jurisdiction of the Commission, as we have heretofore indicated, to determine whether the revised and corrected billing statement should be filed and as an incident of that jurisdiction, to determine the correct rate as of June 7, 1954, for the sale of gas by Phillips to Panhandle under Rate Schedule No. 61. Moreover, it was within the jurisdiction of the Commission under § 5(a) of the Act in a proper proceeding upon its own motion or upon complaint by any state, municipality, state commission, or gas distributing company to determine whether the rate demanded, observed, charged, or collected under Rate Schedule No. 61 was unjust, unreasonable, unduly discriminatory, or preferential, and if it found that it was, to determine the just and reasonable rate to be thereafter observed and enforced and fix the same by order. Necessarily, as a part of the exercise of that jurisdiction it would have to determine what was the rate prescribed and fixed by Rate Schedule No. 61. Since the power to make such determination was within the potential jurisdiction of the Commission, we think it had jurisdiction by declaratory order to make an order to terminate the controversy and remove the uncertainty with respect thereto.

We are of the opinion, however, that the Commission erred in its determination that 3.18236¢ per Mcf was the rate prescribed in and fixed by Rate Schedule No. 61.

While § 154.92 of the Regulations requires a billing for a recent month to be filed with the schedule, § 154.93 in unmistakable terms provides that the rate schedule required to be filed is "the basic contract and all supplements or agreements, amendatory thereof, effective and applicable on and after June 7, 1954." It seems clear to us, therefore, that the price which Phillips

was entitled to receive and Panhandle was obligated to pay, by the terms of the contract, on June 7, 1954, was the rate fixed and prescribed by the rate schedule and that such rate was not the price reflected by the billing statement or actually being paid by the buyer and received by the purchaser on June 7, 1954.

In Natural Gas Pipeline Company of America v. Federal Power Commission, 3 Cir., 1958, 253 F.2d 3, certiorari denied Dorchester Corp. v. Natural Gas Pipeline Co. of America, 1958, 78 S.Ct. 1372, 2 L.Ed.2d 1370, there was involved a contract for the sale of natural gas produced from the Guymon-Hugoton field in the State of Oklahoma, entered into on December 1, 1946, by a seller who was an independent producer, as defined in § 154.91, supra, and a pipeline company as purchaser. The price fixed by the contract for the period from July 1, 1951, to July 1, 1956, was 6.253¢ per Mcf. An order of the Oklahoma Corporation Commission, made on July 29, 1952, fixed a minimum price for gas produced in the Guymon-Hugoton field at 9.8262¢ per Mcf.

On July 1, 1954, the seller filed its rate schedule with the Federal Power Commission, as required by § 154.92, supra. Such rate schedule included a copy of the basic contract and a copy of the Oklahoma Commission's minimum price order.

The pipeline company purchaser paid the increased rate, as fixed by the Oklahoma Commission order, under protest, and by appropriate proceedings challenged the validity of the order. On April 11, 1955, the Supreme Court of the United States in Natural Gas Pipeline Co. v. Corporation Commission of Oklahoma, 349 U.S. 44, 75 S.Ct. 578, 99 L. Ed. 866, held the Oklahoma Commission order invalid.

On December 6, 1954, the seller initiated a proceeding before the Commission to increase the rate of 10¢ per Mcf. The Commission, by order, permitted the 10¢ per Mcf rate to begin, effective as of March 1, 1955, on condition that the seller give a bond, conditioned for the refund, to the buyer of any portion of the increased rate which the Commission should eliminate after a hearing. A controversy arose as to whether the amount of the bond should be based on the difference between a rate of 6.253¢ and 10¢ per Mcf, or the difference between a rate of 9.8262¢ and 10¢ per Mcf. In resolving that controversy, the Commission held that the rate under the rate schedule filed by the seller was 9.8262¢ per Mcf, stating "that the 9.-8262¢ rate was the one actually effective and being paid on June 7, 1954." The Commission held that the facts that the purchaser challenged the validity of the Oklahoma Commission order, paid the amount fixed by that order under protest, and that such order was subsequently adjudged to be invalid, were irrelevant to the determination of the effective rate on June 7, 1954. After such determination the seller withdrew its application to increase the rate to 10¢ per Mcf and reinstated the 9.8262¢ per Mcf rate. The Commission ordered the seller to refund the difference between the 9.8262¢ rate and the 10¢ rate, which had been paid by the purchaser. On petition to review that order the court held that since the order of the Oklahoma Commission was invalid it did not modify the contract rate; that the contract rate could only be changed after a hearing as to its lawfulness under § 5(a) of the Natural Gas Act; and that the contract rate of 6.253¢ per Mcf was the correct and effective rate under the rate schedule filed by the seller, rather than the rate being paid by the purchaser on June 7, 1954.

Cities Service Gas Co. v. Federal Power Commission, 10 Cir., 1958, 255 F.2d 860, involved a contract for the sale of gas to be produced in Kansas by an independent producer and the correct and effective rate under a rate schedule filed by the seller under § 154.92, supra. In that case the base rate under the contract was 6¢ per Mcf. The Kansas Corporation Commission, by order effective January 1, 1954, set a minimum price of

11¢ per Mcf for gas produced from the field from which the gas under the contract was to be produced. The seller, as part of its rate schedule, filed the Kansas Commission's order as Supplement 26. The seller's tendered rate schedule was accepted for filing by the Federal Power Commission on March 21, 1957, "subject, however to the express condition that such acceptance is without prejudice to any claims or contentions which have been made by or for Magnolia Petroleum Company or by or for Cities Service Gas Company in pending litigation concerning this particular sale of gas." On a petition for rehearing the Commission entered a modifying order by which it removed such condition. After the filing of the rate schedule and on January 20, 1958, the Supreme Court of the United States, in Cities Service Gas Co. v. State Corporation Commission of Kansas, 355 U.S. 391, 78 S.Ct. 381, 2 L.Ed.2d 355, held the Kansas Commission order invalid. On petition for review this court held that the legal and effective rate under the rate schedule was not the amount fixed by the void Kansas Commission order, but the contract rate, and reversed the order of the Commission, with instructions to strike Supplement 26 from the rate schedule.

Phillips Petroleum Co. v. Federal Power Commission, 10 Cir., 227 F.2d 470, involved a contract for the sale of gas by an independent producer and the correct and effective rate on June 7, 1954, under a rate schedule filed by the seller under § 154.92, supra.

The contract provided a base rate of 6.6997¢ per Mcf during the first five years of the contract and 7.5930¢ per Mcf during the second five-year period of the contract, and that the base price should be increased in the same ratio as the purchaser's resale rates should exceed 25¢ per Mcf. In March 1951, the purchaser applied to the Commission for an increase in its rates from 28¢ to 31.5¢ per Mcf. The rate was suspended, but upon the expiration of the suspension order and in October, 1951, the pur-

chaser began charging its customers the increased rate of 31.5¢ per Mcf. Thereupon, the parties entered into a letter agreement, whereby in accordance with the formula in the contract the price under the contract was increased to 8.4416¢ per Mcf.

In June, 1952, the purchaser applied for another increase in rates from 31.5¢ to 35¢ per Mcf. The rate was suspended, but upon the expiration of the suspension order and in December, 1952, the purchaser began charging its customers the increased rate of 35¢. Thereupon, the parties entered into another letter agreement, whereby in accordance with the formula in the contract, the price under the contract, effective in January, 1953, was increased to 9.3753¢ per Mcf. On August 31, 1954, in accordance with § 154.92, supra, the seller filed its rate schedule with the Commission, which consisted of the basic contract and the supplemental letter agreements.

Treating the letter agreements as proposals for rate increases not in effect on June 7, 1954, the Commission suspended the rates being collected in accordance therewith and ordered a hearing concerning the lawfulness of such rates. Thereafter, the Commission fixed the purchaser's resale rate at 31.-25¢ per Mcf. In its opinion the court said [227 F.2d 475]:

"It is true, as the Commission argues, that the rate paid Phillips on June 7, 1954 under its contract was tentative in the sense that it was contingent upon the ultimate resale rate established by the Commission for Michigan. But it was nonetheless in force and effect and was being paid not by force of letter agreements, but by force of the binding effect of the escalator clauses which operated to fix the prescribed rate in accordance with the formula in the contract. The letter agreements were merely executory of the contract between the parties. The contract and letter agreements were entered into at a time when the parties were free to contract

with respect to the sale of gas, and the fact that they were contingent upon Michigan's regulated resale rate does not make them any the less applicable and effective to the extent that the regulatory process permitted. When the Commission ultimately determined Michigan's rates to be 31.25¢ per mcf from September 1951 to December 1952, and 31.60¢ thereafter, Phillips' wholesale rate, effective June 7, 1954, was finally and definitely established under the contract. It was less than what they were collecting and Phillips has made refunds in accordance with its contracts. It is significant that the Commission's regulations provided for the filing of all contracts, amendments and supplements as a part of the rate schedules required to be filed reflecting rates applicable on June 7, 1954. The contracts and amendments, including the letter agreements, were filed with the Commission in accordance with the regulations as one rate schedule; they were integrated parts of one contract, the terms and conditions of which operated to establish a determinable rate of 8.-4684¢ as of June 7, 1954, and that rate, being applicable and effective on that date, is not subject to suspension under Section 4(e)."

It will thus be seen that the court held that the applicable and effective rate on June 7, 1954, under the rate schedule, was to be determined by the terms of the contract and the application of the escalator provision therein, even though the rate payable under the contract, as of that date, was contingent upon the resale rate of the seller, thereafter to be approved by the Commission,

and that the price actually being paid by the purchaser to the seller on June 7, 1954, was not the applicable and effective rate on that date, under the rate schedule.

In the instant case there was no contingency. All of the facts essential in the application of the formula set forth in Paragraph 15(d) of the contract were in existence and readily ascertainable on February 1, 1952.

Under the Natural Gas Act the rate to be charged for natural gas is initially fixed by contract between the seller and the purchaser.[7] The initial rate thus fixed may be changed by order of the Commission in a proceeding under § 5(a) of the Natural Gas Act, upon a finding by the Commission that the rate charged is unjust, unreasonable, unduly discriminatory, or preferential, and therefore unlawful,[8] but the Commission has no initial rate-making powers and an initial rate fixed by contract remains in effect unless and until it is changed in a proceeding under § 4(d) and (e) or § 5(a) of the Natural Gas Act.[9] Here, the initial rates were fixed by the contract; the initial rate, effective under the contract on June 7, 1954, was the rate under Rate Schedule No. 61; and such rate could not be changed by the fact that a lesser amount was being collected or by the filing of a billing statement, but only by an order of the Commission in a proper proceeding, either under § 4(e) or § 5(a) of the Natural Gas Act.

The contract rate in effect on June 7, 1954, was 3%6¢ per Mcf at 16.4 psia, plus the increase provided for in Paragraph 15(d) of the contract, arrived at by applying the formula provided for in Paragraph 15(d) of the contract to the weighted average royalty rate being paid

7. United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 338, 341, 76 S.Ct. 373, 100 L.Ed. 373.

8. United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 341, 76 S.Ct. 373, 100 L.Ed. 373.

9. United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 341, 76 S.Ct. 373, 100 L.Ed. 373; Natural Gas Pipeline Company of America v. Federal Power Commission, 3 Cir., 253 F.2d 3, certiorari denied Dorchester Corp. v. Natural Gas Pipeline Co. of America, 1958, 357 U.S. 927, 78 S.Ct. 1372, 2 L.Ed. 2d 1370.

on February 1, 1952, or on June 1, 1954, should the Commission determine the latter date is the applicable one, on gas produced in Moore County, Texas, and delivered to major pipeline companies and required to be paid by Phillips as royalty. While to give effect to the provisions of Paragraph 15(d) required the ascertainment of facts and the application of the formula to such facts, such facts were readily ascertainable and the obligation of the buyer to pay and the right of the seller to receive such increased price was definitely fixed by the contract. That being the rate fixed by the contract, it could not be changed other than by an order of the Commission after it had found the contract rate to be unlawful in a proceeding under § 5(a) of the Natural Gas Act, or by a proceeding commenced by Phillips for a change in rates, under § 4(d).

In Phillips Petroleum Co. v. Federal Power Commission, 10 Cir., 227 F.2d 470, this court held that the Federal Power Commission could not suspend a rate in effect under an escalator provision in a contract or in a supplement thereto on or prior to June 7, 1954, and filed as part of the rate schedule.

No doubt the Commission could have required each independent producer to file as a part of his rate schedule the price such producer was entitled to receive and his purchaser obligated to pay under the provisions of the contract on June 7, 1954, and perhaps it would have been better had the Commission done so. Of course, to be effective it would have had to reflect correctly the then effective contract rate. However, the Commission did not so require and it expressly provided that the rate schedule should be the basic contract and all supplements or agreements amendatory thereof effective and applicable on or after June 7, 1954.

Accordingly, we conclude that the correct and effective price under the rate schedule was the price Phillips was entitled to receive and Panhandle was obligated to pay on June 7, 1954, under the terms of the contract.

 The Examiner determined that such price was 3.46363¢ per Mcf at 14.65 psia. The Commission should accept that as the contract price in effect on June 7, 1954, and as the effective rate on that date, unless it finds the determination of the amount of the increase under Paragraph 15(d) was incorrectly decided by the Examiner. In that event, it should determine the correct amount and the resulting effective rate. It should then order the filing of the corrected billing statement reflecting such effective rate.

The order is reversed and the matter remanded for further proceedings before the Commission in accordance with the views herein expressed.